SHELTER MUTUAL INSURANCE
COMPANY, Plaintiff,

v.

Robert TUCKER, Charles E. Tucker, Betty Tucker, Sharon Ziegler, Sheila Hunt, Cheryl N. Hung, Homer Click, Todd E. Click, Margaret Phipps, Cynthia R. Phipps, Maude White, Allstate Insurance Company, Provident Life and Accident Insurance Company, and United States Fidelity & Guaranty Insurance Company, Defendants.

No. 81–2965H.

United States District Court,
W.D. Tennessee, W.D.

Sept. 11, 1987.

James E. Conley, Jr., Thomason, Crawford & Hendrix, Memphis, Tenn., for plaintiff.

Saul Kay, James W. Cook, David Cobb, Neely, Green, Fargarson & Brooke, Orville Almon, Jr., Leonard V. Hughes, Jr., Larry E. Killebrew, Memphis, Tenn., for defendants.

## ORDER GRANTING JUDGMENT TO DEFENDANTS

HORTON, Chief Judge.

Shelter Mutual Insurance Company (Shelter), plaintiff, filed this declaratory judgment action requesting the Court to rule the automobile insurance policy issued to Charles E. Tucker and Betty Tucker did not provide liability coverage for an automobile accident occurring on September 16, 1981, which gave rise to this lawsuit. The sole issue before the Court is whether the 1974 Opel automobile driven by Robert Tucker on September 16, 1981, was furnished or available for the regular use of the named insureds, Charles E. Tucker or Betty Tucker or a member of their household, Robert Tucker, their son.

Considering the totality of all of the evidence presented to the Court, and considering the applicable provisions of the insurance policy, the Court concludes, from the preponderance of the evidence, Shelter Mutual Insurance Company is liable on its policy of automobile liability insurance with Charles E. Tucker and Betty Tucker. The Court concludes, from a preponderance of the evidence, the 1974 Opel automobile driven by Robert Tucker on September 16,

1981, the date of the accident causing this litigation, was not furnished or available for the regular use of the insureds Charles E. Tucker or Betty Tucker or for Robert Tucker, their son and a member of their household.

Although the Court is concerned only with the issue of insurance coverage, a background statement narrating events leading up to and occurring after this lawsuit was filed may be helpful to an understanding of the issue presented to the Court and how that issue is resolved by the Court.

Shelter's predecessor, MFA Mutual Insurance Company, entered into a contract of automobile liability insurance with Charles E. and Betty Tucker, the same being policy number 41–1–1882926–3, covering a 1979 Chevrolet pickup truck. The policy was issued to Charles E. and Betty Tucker and covered, among other times, the period from June 25, 1981 until November 29, 1981. This policy provided limits of liability coverage of $100,000 for each person, $300,000 per accident for bodily injury and $25,000 for property damage. Among other things, the policy contained the following definition of persons insured for coverage for bodily injury liability and property damage liability:

Person insured—with respect to the insurance afforded under coverages A and B, the following are insureds: ... (b) With respect to a non-owned automobile, (1) the named insured and, if an individual, his spouse, provided his or her actual operation or (if he or she is not operating) the other actual use thereof by the named insured or his spouse is with the permission, or reasonably believed to be with the permission, of the owner of such automobile and is within the scope of such permission, and (2) any other person or organization not owning or hiring the automobile, but only with respect to his or its liability because of acts or omissions of the named insured or his spouse under (b)(1) above.

The facts which gave rise to the present lawsuit and are now before the Court for determination relate to whether the above provision provides liability coverage for the plaintiffs.

At approximately 10:45 a.m. on September 16, 1981, Robert A. Tucker, the son of Charles and Betty Tucker, while driving a 1974 Opel 2–door car registered in the name of Maude White, was involved in a collision with a 1973 Ford station wagon driven by Sharon Ziegler and owned by David and Sharon Ziegler. This collision occurred at the intersection of Chuck Road and Knight Road, Memphis, Tennessee. As a result of this accident, several lawsuits alleging personal injury and property damage have been filed in the Circuit Court of Shelby County, Tennessee.

Shelter seeks a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201 *et seq.*, that Shelter is not:

Obligated under and by virtue of the said policy of insurance to appear and defend any suits growing out of the September 16, 1981, accident, or to assume any liability for the acts of Robert Tucker at the time of said accident, and that at the time and place of the accident the 1974 Opel driven by Robert Tucker and registered to Maude White was not covered by the insurance policy issued to Charles E. and Betty Tucker.

It is the position of Shelter that the 1974 Opel automobile (Opel) registered to Maude White is not within the coverage of the insurance policy issued to the Tuckers which is the subject of this lawsuit. Shelter further claims the 1974 Opel was owned by Maude White, mother-in-law of Charles Tucker and mother of Betty Tucker. Shelter claims the 1974 Opel was furnished or available for the regular use of Charles and Betty Tucker and members of their household. As a result, the Opel is not within the insurance policy definition of a non-owned automobile. Shelter relies upon the following definition under the issuing agreements of its policy:

Except where stated to the contrary, it is agreed that the following definitions apply:

.    .    .    .    .

(6) "Non-owned automobile" means any automobile other than (a) the described

automobile, or (b) an automobile owned in whole or in part by, or furnished or available for regular use of, either the named insured or any resident of the same household.

It is the contention of Shelter that if the Opel, owned by Maude White, was furnished or available for the regular use of either Charles or Betty Tucker or any resident of the Tucker household, then the Opel is not insured under this policy.

Charles Tucker, Betty Tucker, and all the named defendants on the Tucker's behalf, deny the 1974 Opel was furnished or available for the regular use of Charles or Betty Tucker or members of their household. Defendants contend the Opel is a "non-owned automobile" within the meaning of the policy and therefore is covered by the Shelter policy at issue.

Shelter filed a motion for summary judgment in the instant case asserting it was entitled to judgment as a matter of law, as there were no genuine issues of material fact. On February 3, 1984, the Court denied Shelter's motion for summary judgment upon finding there exists a genuine issue of material fact as to whether the automobile in question was furnished or available for the regular use of the insured and, consequently, excluded from coverage. Following a pretrial conference held in February of 1986, defendants Robert Tucker, Charles Tucker and Betty Tucker filed a motion for summary judgment arguing Shelter was estopped from denying coverage due to its conduct in the investigation and defense of the accident and subsequent lawsuits. All the original defendants joined in that motion. Shelter filed a motion for partial summary judgment on the same issue arguing it should be found, as a matter of law, Shelter is not estopped from denying coverage and that it did not waive the right to assert such a defense. Shelter also filed a motion for partial summary judgment on issues of waiver, estoppel and reformation as raised in the answers of defendants Homer Click, Todd Click and the Tuckers. The Clicks also asserted a counterclaim in their amended answer. It appeared that claim was based on the erro-neous assumption that Shelter denied insurance coverage of the subject accident because the driver, the Tuckers' minor son Robert, was not covered by the Tuckers' policy.

On April 28, 1986, a hearing was held to allow argument on the pending motions. The Court concluded defendants' motion for summary judgment should be denied and plaintiff's motion for partial summary judgment granted, as the Court determined defendants suffered no prejudice as a result of Shelter's actions and Shelter did not waive its right to deny coverage by its actions in this case. The Court, further, found plaintiff's motion for partial summary judgment as to the issues raised concerning the alleged statements of Shelter's representative should also be granted. As to the issue of reformation, the Court determined the matter was moot. Additionally, the Court concluded the Clicks' counterclaim should be dismissed, as Shelter admitted Robert Tucker was insured under the Tuckers' policy.

On August 27, 1986, the Court heard testimony and all evidence presented and made these findings of fact:

The Tuckers carried automobile liability coverage with MFA Insurance Company which later became Shelter Mutual Insurance Company (Shelter) that was in effect on the date of the accident. (Tr. 20, 21). Shelter issued four liability insurance policies for the Tucker family (Tr. 47, 48).

Charles and Betty Tucker had two vehicles, a 1979 pickup truck and a chevrolet Monte Carlo automobile insured with Shelter. (Tr. 67–68). The Tuckers oldest son Charles II, owned a pickup truck which he insured through Shelter and their daughter also had a vehicle insured through Shelter. Initially the minor, Robert was excluded from coverage, but the driver exclusion on him was removed June 25, 1981. (Tr. 83). The Opel automobile, the vehicle driven by Robert Tucker in the accident, was purchased in the name of Maude White. (Tr. 71).

Shelter made a decision based upon the claim committees investigation that there would be no coverage provided by the poli-

cy in question or any other policy of the Tuckers for the accident. (Tr. 22). Mr. Moran stated:

> The claim was submitted to our home office claim committee, on which I sit, for a determination of coverage by the Memphis, Tennessee branch claim office. An investigation had been made into the accident and into the facts surrounding the vehicle involved. It was done by the nature of statements, a picture was obtained of the vehicle that was involved, it was in rather bad condition at the time after the accident, but—and some information relative to the salvage, I believe, was obtained. This was all submitted to us in Columbia for a decision as to whether coverage—included statements from Mr. Tucker, Robert Tucker, Maude White, and I think a second time from Mr. Robert Tucker and from perhaps Mr. Tucker. We also discussed the accident with an employee at the Memphis vocational school that Mr. Tucker attended, obtained statements from these people, these were submitted to us. We reviewed those in conjunction with the policy of insurance, which is a standard policy of insurance in Tennessee, and it was our decision upon review of all of this that there was no coverage available. (Tr. 24–25).

The liability policy covered (1) the described vehicle, the chevrolet pickup truck; (2) a temporary substitute vehicle; and (3) non-owned vehicles which were defined as:

> Any other automobile other than (a) the described automobile or (b) an automobile owned in whole or in part by, or furnished or available for the regular use of, either the named insured or any resident of the insured's household. (Tr. 43, 45).

In deciding to deny coverage, the claim committee decided the Opel vehicle was furnished or available for the regular use for either of the named insureds or any resident of the same household. (Tr. 46)

*Charles Tucker's* deposition testimony stated the 1974 Opel automobile was purchased March 27, 1981. (Tr. 87, 88). Before the purchase of the Opel, Mrs. Maude White depended a great deal on the Tucker's daughter for transportation. The Tucker's daughter was to marry in May of 1981, which would limit the daughter's availability to transport Mrs. White. (Tr. 97). Mrs. White had asked Mr. Tucker to look for a car for her, and she paid for the car. After purchasing the Opel automobile, it was inoperable almost all through July of 1981. (Tr. 88). The Opel was taken to the Tucker's house to be worked on because Mr. Tucker had his tools there. (Tr. 94). Just about everything was wrong with the Opel automobile, carburetor, transmission and brakes. (Tr. 93). Mr. Tucker did not begin to work on the brakes right away because he was waiting on the title. (Tr. 117). It took approximately one month to get the title to the Opel. (Tr. 95).

Charles Tucker further testified the first work he did on the Opel was the brakes. He had to get the pad, and bleed the linings. Repair went on for about a month. The Opel was then returned to Mrs. White's house. (Tr. 175, 197–198). The Opel stayed at Mrs. White's house for about a month. Someone tried to steal the automobile, so it was brought to the Tucker's house. No one used the car then. (Tr. 176, 198). Thereafter, Mr. Tucker went into the hospital for a hernia operation. He was released from the hospital about June 5th or 6th, 1981 and was off work for about two weeks. During that time, Robert Tucker, Charles Tucker's son, was taking drivers training and was using the pickup truck and every once in a while, the Monte Carlo. (Tr. 177, 199). The Opel was taken back to Mrs. White some time during that period, and Mr. Tucker went back to get it when he felt he had recovered sufficiently to work on it. (Tr. 178, 199–200).

Mr. Tucker did carburetor work and installed spark plugs probably about the middle of July, 1981. He had to find a carburetor for this foreign car and then worked on it off and on experimenting to get the carburetor to work. After he got the carburetor to work, he took the Opel back to Mrs. White. The car, then, had problems with its clutch. Mr. Tucker took the car back to his house and then to Mr. Joyner who ultimately replaced the clutch. It took

Mr. Joyner approximately a week for that work. (Tr. 179, 180, 200).

The next problem was a transmission leak. The Opel was taken to a transmission shop and an appointment was made for work but the accident occurred before the appointment. (Tr. 179–182). Of all the time the Opel was at the Tucker house, it was there for repair or tune-up, "... ninety percent of the time just about, really all the time." (Tr. 183). The whole time the Opel was at the Tucker's house, it was probably operable fifteen days at the most. (Tr. 188).

Prior to the accident, Mr. Tucker might have driven the Opel to the grocery store once for his own use, the rest of the time it was to check out the repairs, the brakes and adjust the carburetor. Mr. Tucker may have driven Mrs. White in the Opel a few times. (Tr. 96, 98). In any event, each member of the Tucker family had his or her own vehicle and an insurance policy with Shelter covering that vehicle except for Robert Tucker who had saved up $500.00 and was shopping for a pickup truck. (Tr. 99). Robert Tucker, further, had already purchased for $500.00 stereo equipment that would be placed in the vehicle he would purchase. He did not put that equipment in the Opel. (Tr. 99).

At the time of the accident, school had been in session twelve days. One day was a holiday. Robert used the Opel for school three days, the Monday and Tuesday before the accident and the Wednesday of the accident. (Tr. 182, 183). Charles Tucker testified as follows as to the events surrounding the accident:

Q. On this particular time when we come to the time close to the accident, the Monday, what was the family situation on that Monday, and why did Rob take the car?

A. Wife was off sick, and she had to go to the doctor.

Q. What were you doing?

A. I had to go to work.

Q. Do you know, how would Rob go about using that Opel, who would he ask?

A. He had to get permission, you know, his mother or me.

Q. What about Mrs. White?

A. He would usually ask her. Above all he had to have permission from us.

Q. Why would he have to have any permission from you?

A. Because I didn't allow him to get out, you know, drive without permission.

Q. Just the Opel?

A. Any vehicle.

Q. Did he have to come to you for permission about any other things?

A. Yes, sir.

Q. All right. Monday you told us about, what about Tuesday, what happened Tuesday,

A. I believe my wife had a doctor's appointment then, I can't remember exactly.

Q. Your deposition seemed to say that you were off work?

A. Oh, my day off, I went to Independence on business.

Q. Now, Wednesday, what happened Wednesday?

A. That was my wife's doctor's appointment.

Q. And where were you?

A. I was at work.

Q. Why could Rob not take the bus these days?

A. On Wednesday, one of the days, he missed the bus.

At the time surrounding the accident, the above testimony indicated on:

Monday—Mrs. Tucker was sick and had to go to the doctor. Mr. Tucker had to go to work. (Tr. 185).

Tuesday—Mrs. Tucker had a doctor's appointment and Mr. Tucker went to Independence, Mississippi on business. (Tr. 186).

Wednesday—Wife went to doctor and Mr. Tucker went to work. Robert missed the bus. (Tr. 186)

*Mary Lancaster*, a former neighbor of the Tuckers, observed the Opel vehicle at the Tucker's house, parked in the street in June of 1981. The vehicle appeared abandoned at first. Afterwards, she saw the

Tuckers working on the Opel for a week or two. She saw Charles Tucker test driving the car, but never saw the family get in the car to go anywhere. (Tr. 145–148).

*Robert Tucker's* deposition testimony stated he had used the Opel to go to school only the Monday, Tuesday and Wednesday of the week of the wreck. Robert drove the vehicle once or twice to Target by himself and drove Mrs. White in it once or twice, once to church and once to the grocery store. Robert drove his father's pickup truck the most. (Tr. 116). When Robert drove the Opel to Target he had to ask Mrs. White and then tell his father that Mrs. White told him it was okay in order to get the keys from his father. (Tr. 117). Robert, further, testified on July 13, 1981, he turned sixteen (16) and went that day to the Highway Patrol Station to get his driver's license. Robert always wanted a truck. He went to a stereo shop that same July and purchased $500.00 worth of automobile stereo equipment. Robert put the equipment in a closet. He wanted to buy a 1968 Chevrolet pickup truck for himself. He had saved up $500.00 toward the purchase (Tr. 155–157). From the time of the purchase of the Opel vehicle until the accident, Robert estimated he had driven the vehicle maybe six times (Tr. 158) or as many as ten times (Tr. 166) counting taking his grandmother to the store, going to school, driving it to work and test driving it to see if it could kick into gear.

*Maude White's* affidavit stated it was her intention at the time of the purchase of the automobile to have a vehicle which could be used by friends and family members to take her back and forth to church or the grocery store or other errands since she did not drive at that time and did not wish to not only have to rely upon her friends or family to drive her, but to further have to rely upon them using their automobile and gas. Further, the deposition testimony of Maude White reads as follows:

"Your name is Maude White?

"Yes, sir.

"You are Mr. Tucker's mother-in-law?

"Yes, sir.

"Where do you live?

"I live on Mallory.

"Is that close to where the Tuckers live?

"I don't know about how far it is. Something like a mile, isn't it?"

"Now, do you have a driver's license, Mrs. White?

"No, sir.

"Have you ever had a driver's license?

"No, I haven't.

"Did Mr. Tucker find the car for you?

"Yes, sir.

"Did you ever see it before it was paid for?

"Yes, sir.

"Did you go to the gentleman's house and look at it?

"No, I didn't go.

"Did you see it before it was purchased?

"You mean before?

"Before it was purchased.

"No, I didn't.

"Have you ever owned a car before?

"No, sir.

"Did you know that Mr. Tucker or Mrs. Tucker or Rob or Charles or Janna could drive that car?

"Yes, sir, they could have.

"And it was only one set of keys?

"Yes.

"And that was at the Tuckers?

"Yes.

"Did you ever tell anyone they couldn't drive the car?

"No, sir, they never did ask me not to.

"They didn't ask me to not to let them have it.

"That was going to be my next question, did they ask you or did they ask Mr. Tucker?

"All just one big family, whatever."

"Do you remember who asked you if they could drive it?

"Answer, Charles did?

"Charles, Sr. or Charles, Jr.?

"Answer. Charles?

"Question. Charles, Sr. Was that when you first brought it over to their house?

"Yes, sir.

"And you told him yes?

"Yes."

That's on page 8.

"Did you ever tell him no—", and this means Robert Tucker, "—that he couldn't drive it?

"No."

That's on page 9.

On page 10.

"As far as you were concerned was it okay for them to drive it when they needed to drive it?

"Yes, sir.

"And did Mr. Tucker or Mrs. Tucker have to ask you about being able to drive it?

"No, she didn't ever drive it that many times. Maybe while it was at their house, come after me to do their washing and ironing.

"If she had wanted to drive it, would she have had to ask you?

"No, I don't think she would."

MR. CONLEY: I believe that is all of that deposition, Your Honor.

MR. COOK: On page 6, line 6. Question by Mr. Conley.

"And you purchased the 1974 Opel, is that correct?

"Answer. Yes, sir."

MR. COOK: Page 7 there's an exchange with the court reporter but it picks up:

"What happened to the car after it was purchased, where did it go?

"Answer. You mean at my house or his?

"Yes, ma'am.

"Answer. It stayed at my house some and his house, too.

"You heard Mr. Tucker explain about it being repaired, is that pretty much correct as you recall?

"Answer. Yes, sir."

Going back to, or page 8 I should say and backing up on part of it that Mr. Conley read.

"Question. That was going to be my next question, did they ask you or did they ask Mr. Tucker?"

Maybe I should backup, that's out of context.

Going back to page 7.

"Question. Did you ever tell anyone that they couldn't drive the car?

"Answer. No, sir, they never did ask me not to.

"Question. I'm sorry ma'am.

"Answer. They didn't ask me to not to let them have it.

"Question. That was going to be my next question, did they ask you or did they ask Mr. Tucker?

"Answer. All just one big family, whatever.

"Question. As far as—well, let me go back to my question, did they ever ask you if they could drive it?

"Answer. Yes, sir.

"Question. And you just told them yes.

"Answer. Yes."

Page 8 towards the bottom, line 14.

"Do you remember who asked you if they could drive it?

"Charles did.

"Charles, Jr. or Charles, Sr.?

"Charles.

"Charles, Sr. Was that when you first brought it over to their house?

"Yes, sir.

"And you told him yes?

"Answer. Yes.

"Question. Mr. Tucker said that Rob drove the car to school Monday, Tuesday and Wednesday, the week of the accident, did you know that before the accident happened?

"Answer. No, I didn't know he went that morning, but I knew that he had done it a day or two.

"Did you know that he it before he did it or after he did it?

"It was after—I mean before.

"So, you knew before Monday, you knew he was going to drive it on Monday?

"Answer. Yes.

"Question. How did you know that?

"Answer. He always called, called me.

"Question. And what would he do when he called you?

"Answer. He just asked me if he could.

"Question. He would call and ask if he could drive it?

"Answer. Yes.

"Question. And you would say okay?

"Answer. Yes.

"Question. Did you ever tell him no?

"Answer. No he didn't drive it that many times."

I might as well finish that out.

"Question. Did you ever tell him no, that he couldn't drive it?

"Answer. No.

"Question. About how many times do you recall that he might have driven it?

"Answer. I don't remember.

"Question. As far as you were concerned was it okay for them to drive it when they needed to drive it?

"Answer. Yes, sir.

"Question. And you—"

Page 10, line 13.

"Question. You paid for part of the repairs to the clutch?

"Answer. Yes, sir.

"Question. Did you pay Mr. Tucker anything for the work he did?

"Answer. No.

"Question. Did you know about all the work he was doing?

"Answer. I knew they was working on it, but I didn't know what.

"Question. But you knew it needed some work.

"Answer. Yes.

"Question. Would you have given that car to Rob if he had asked you?

"Answer. No."

"Cross-examination by myself, James Cook.

"Question. Mrs. White, do you know who Donald Plattner is?

"Answer. No, I don't.

"Question. Do you remember some time in September after this accident some man calling you on the phone and asking you some questions?

"Answer. Yes, sir.

"Question. Do you remember who he was?

"Answer. He told me, but I don't remember.

"Question. All right. Do you remember what the conversation was about?

"Answer. It was about the car.

"Question. All right. What was your state of health at that time?

"Answer. I was so nervous, I didn't know hardly know—", excuse me, "—I was so nervous I didn't hardly know I was living, I was so scared that some of them was going to be—might die or something and Rob, too.

"Question. Were you under a doctor's care?

"Answer. Yes.

"Question. Were you on medication?

"Answer. Yes, sir.

"Question. All right. Were you the owner of this car, this Opel?

"Answer. Yes.

"Question. Do you remember telling somebody else that you weren't the owner?

"Answer. No, I don't remember that.

"Question. All right. You were raised on a farm, weren't you?

"Answer. Yes.

"Question. You have driven vehicles on the farm, haven't you?

"Answer. Tractor."

MR. KAY: The only one is on page 11, question by Mr. Conley.

"Did you have any insurance on the car, ma'am?

"Answer. No, I didn't. If I ever got it fixed like it should have been, I was fixing to get insurance on it."
(Tr. 105–113).

*Betty Tucker* testified that Maude White needed the vehicle for transportation. The Tucker's daughter who was getting married used to do Maude White's running around. She would carry her home in the afternoon, to the grocery, and to church. Betty worked, her husband worked and Maude White had no way to go anywhere. (Tr. 215–217). Further, after the Opel was purchased, Betty testified she tried to drive it one afternoon, got about fifty feet up the street and did not know how to drive it. (Tr. 211).

*Todd Click* and Robert Tucker were friends in September of 1981. Todd met Robert at school. Robert principally drove a pickup truck. He saw Robert drive the Monte Carlo approximately two times (Tr. 122). The only times Todd saw Robert drive the Opel were the two days before the accident, September 14 and 15 of 1981 and the date of the accident, Wednesday, September 16, 1981. (Tr. 133). Additionally, Todd saw Robert out at night during the summer. Todd recalled seeing Robert at the park in the pickup and maybe out once or twice in the Monte Carlo. (Tr. 124). During the school year before the accident, Todd Click saw Robert on occasions other than school at Lichterman Park in the pickup truck. Todd, further, recalled Robert riding the bus (Tr. 226) to school with him probably twice and riding to school with other people once. (Tr. 227).

*Cynthia Phipps* met Robert Tucker before school started the fall of 1981. Cynthia only remembered Robert driving the Opel the two days before the accident and the day of the accident. She believed she saw Robert in the pickup truck at Lichterman Park. (Tr. 229). Cynthia, further, remembered being with Robert on the school bus on a couple of occasions and remembered being with Robert in the school parking lot in the pickup truck a couple of times. (Tr. 232).

Having delineated the contentions of the litigants and the proof offered in support thereof, the Court finds, after hearing all of the proof, reviewing the record, reading the briefs of counsel, hearing oral arguments at trial and conducting its own research on the applicable law, the insurance policy in question did provide liability coverage for the automobile accident which gave rise to this lawsuit.

The Court's jurisdiction in this case is based on diversity of citizenship. Accordingly, the Court must apply the substantive law of Tennessee to resolve the matter now pending before this Court. See *Erie Railroad Co. v. Thompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Only one Tennessee case dealing with a non-owned automobile exclusion has been located. In *United Services Auto Assoc. v. Couch*, 643 S.W.2d 668 (Tenn.Ct.App.1982), the Tennessee Court of Appeals looked at a non-owned automobile exclusion similar to the one in the Shelter policy. There the court of appeals stated:

The obvious purpose of the "non-owned vehicle" coverage is to afford protection to the insured on occasions when the insured is temporarily using a vehicle not covered by the policy.

The obvious purpose of the exclusion under discussion is to prevent abuse of the "non-owned" privilege by unnecessarily burdening the insurer with liability which ought to be covered by other insurance. For example, the exclusion excludes the insured from coverage on a second vehicle which he has not insured, or from coverage on a vehicle which insured has placed in the name of another in order to "borrow" it and use it without paying additional premium for the coverage.

Also, the purpose of the exclusion is to deny coverage to the insured while using a vehicle as to coverage of which he has opportunity to investigate. If a vehicle is not regularly available to insured and

if insured uses a vehicle only on isolated occasions, it would not be expected that he inquire as to liability insurance on the vehicle. If, however, insured has available to him or uses a vehicle with any degree of regularity, it is expected that he would ascertain whether the vehicle is covered by liability insurance, and, if not, would arrange for suitable protection for himself.

*Id.* at 672.

The *Couch* court, further, in reaching its decision outlined the definitions of "regular" use which the Court considered in reaching its decision. The Court noted:

Definitions of the word, "regular" include:

3a   steady or uniform in course, practice or occurrence; not subject to unexplained or irrational variation; steadily pursued; orderly, methodical.

b   (1) returning, recurring or received as stated, fixed or uniform intervals, (2) functioning at uniform intervals,

4a   constituted, selected, made or otherwise handled in conformity with established or prescribed usages, rules or discipline.

(Webster's Third International Dictionary, Unabridged.)

Steady or uniform in course, practice or occurrence; not subject to unexplained or irrational variation. [Rooney] *Rodney v. City of Omaha*, 104 Neb. 260, 177 N.W. 166. Made according to rule, duly authorized, formed after uniform type, built or arranged according to established plan, law or principle. *Merchant's Nat. Bank of Los Angeles v. Continental Nat. Bank of Los Angeles*, 98 Cal. App. 523, 277 P. 354, 361. Antonym of "casual" or "occasional." *Palle v. Industrial Commission*, 79 Utah 47, 7 P.2d 284, 290, 81 A.L.R. 1222. (Black's Law Dictionary Fourth Edition)

Pursuant to *Couch*, the issue of regularity hinges upon the regularity with which the vehicle was furnished or available. Additionally, the obvious purpose of the "non-owned vehicle" coverage is to afford protection to the insured on occasions when the insured is temporarily using a vehicle not covered by the policy. The obvious purpose, further, of the exclusion under discussion is to prevent abuse of the "non-owned" privilege by unnecessarily burdening the insurer with liability which ought to be covered by other insurance. *Couch*, at 672.

In view of the *Couch* decision, the Court is convinced the 1974 Opel driven by Robert Tucker on September 16, 1981, the day of the accident, was not furnished or available for the regular use of the named insureds, Charles Tucker or Betty Tucker or a member of their household, Robert Tucker.

Charles Tucker's deposition testimony read:

... the 1974 Opel automobile was purchased March 27, 1981. (Tr. 87, 88). Before the purchase of the Opel, Mrs. Maude White depended a great deal on the Tucker's daughter for transportation. The Tucker's daughter was to marry in May of ¨1981, which would limit the daughter's availability to transport Mrs. White (Tr. 97). Mrs. White had asked Mr. Tucker to look for a car for her, and she paid for the car. After purchasing the Opel automobile, it was inoperable almost all through July of 1981. (Tr. 88). The Opel was taken to the Tucker's house to be worked on because Mr. Tucker had his tools there. (Tr. 94).

Charles Tucker, further, testified after the first work was done on the Opel, ... The Opel was then returned to Mrs. White's house. (Tr. 175, 197–198). The Opel stayed at Mrs. White's house for about a month. Someone tried to steal the automobile, so it was brought to the Tucker's house. No one used the car then. (Tr. 176, 198) ... Of all the time the Opel was at the Tucker house, it was there for repair or tune-up, "... ninety percent of the time just about, really all the time." (Tr. 183). The whole time the Opel was at the Tucker's house, it was probably operable fifteen days at the most. (Tr. 188).

Additionally, prior to the accident, Mr. Tucker might have driven the Opel to the grocery store once for his own use, the rest of the time it was to check out the repairs,

the brakes and adjust the carburetor. Mr. Tucker may have driven Mrs. White in the Opel a few times. (Tr. 96, 98). The Court, therefore, concludes it is clear the 1974 Opel was not furnished or available for the regular use of Charles Tucker. Other than driving the vehicle to the store once for his own use, Mr. Tucker only drove the vehicle to check out the repairs. Furthermore, the Court's conclusion is buttressed by the fact that the vehicle was at the Tucker's home ninety percent of the time for repairs, and was also only operable fifteen days at the most.

The Court, therefore, concludes the preponderance of the evidence shows the 1974 Opel was not furnished or available for the regular use of Charles Tucker. Other than driving the vehicle to the store once for his own use, Mr. Tucker only drove the vehicle to check out the repairs. Furthermore, the Court's conclusion is buttressed by the fact that the vehicle was at the Tucker's home ninety percent of the time for repairs, and was also only operable fifteen days at the most.

Betty Tucker, further, testified after the Opel was purchased she tried to drive it one afternoon, got about fifty feet up the street and did not know how to drive it. (Tr. 211).

The Court therefore finds the preponderance of the evidence is that the Opel was not furnished or available for the regular use of Betty Tucker.

In the deposition testimony of Robert Tucker, Robert stated he had used the Opel to go to school only the Monday, Tuesday and Wednesday of the week of the wreck. Robert drove the vehicle once or twice to Target by himself and drove Mrs. White in it once or twice, once to church and once to the grocery store. Robert drove his father's pickup truck the most. (Tr. 116). When Robert drove the Opel to Target he had to ask Mrs. White and then tell his father that Mrs. White told him it was okay in order to get the keys from his father. (Tr. 117).

Robert, further, testified on July 13, 1981, he turned sixteen (16) and went that day to the Highway Patrol Station to get his driver's license. Robert always wanted a truck. He went to a stereo shop that same July and purchased $500.00 worth of automobile stereo equipment. Robert put the equipment in a closet. He wanted to buy a 1968 Chevrolet pickup truck for himself. He had saved up $500.00 toward the purchase (Tr. 155–157). From the time of the purchase of the Opel vehicle until the accident, Robert estimated that he had driven the vehicle maybe six times (Tr. 158) or as many as ten times (Tr. 166) counting taking his grandmother to the store, going to school, driving it to work and test driving it to see if it could kick into gear.

Robert Tucker's testimony was further substantiated by the testimony of Todd Click and Cynthia Phipps. Todd Click and Robert Tucker were friends in September of 1981. Todd met Robert at school. Todd testified Robert principally drove a pickup truck. He saw Robert drive the Monte Carlo approximately two times (Tr. 122). The only times Todd saw Robert drive the Opel were the two days before the accident, September 14 and 15 of 1981 and the date of the accident, Wednesday, September 16, 1981. (Tr. 133). Additionally, Todd saw Robert out at night during the summer. Todd recalled seeing Robert at the park in the pickup and maybe out once or twice in the Monte Carlo. (Tr. 124). During the school year before the accident, Todd Click saw Robert on occasions other than school at Lichterman Park in the pickup truck. Todd, further, recalled Robert riding the bus (Tr. 226) to school with him probably twice and riding to school with other people once. (Tr. 227).

Cynthia Phipps met Robert Tucker before school started the fall of 1981. Cynthia only remembered Robert driving the Opel the two days before the accident and the day of the accident. She believed she saw Robert in the pickup truck at Lichterman Park. (Tr. 229). Cynthia, further, remembered being with Robert on the school bus on a couple of occasions and remembered being with Robert in the school parking lot in the pickup truck a couple of times. (Tr. 232).

Considering the testimony of Robert Tucker, in addition to testimony of Todd Click and Cynthia Phipps, the Court concludes the preponderance of the evidence shows the 1974 Opel was not furnished or available for the regular use of Robert Tucker. Use of the Opel to go to school the Monday, Tuesday and Wednesday of the week of the wreck, in addition to driving the Opel once or twice to Target, does not constitute being furnished or available for the regular use pursuant to *Couch.* Furthermore, the fact that Robert had driven the vehicle six or ten times counting driving his grandmother to the store, driving to school and to work, and test driving the Opel falls short of regular use as defined by *Couch.*

It is also, in any event, noted that to characterize Robert's use of the Opel as regular would be contrary to the underlying purpose of the insurance coverage which is to afford protection to the insured on occasions when the insured is temporarily using a vehicle not covered by the policy. The Court is convinced Robert's use of the Opel was temporary at most. Additionally, the Court is further persuaded by testimony of Robert Tucker's friends, Todd Click and Cynthia Phipps, who stated Robert was seen driving the pickup truck and Monte Carlo to school and Lichterman Park. Even more, Robert had purchased stereo equipment which he planned to install in a 1968 chevrolet pickup truck he intended to purchase.

The Court further finds by a preponderance of the evidence the Opel was not furnished or available for the regular use of the Tuckers or a member of their household. Maude White's affidavit stated it was her intention at the time of the purchase of the automobile to have a vehicle which could be used by friends and family members to take her back and forth to church or the grocery store or on other errands. Maude White did not drive at that time and did not wish to not only have to rely upon her friends or family to drive her, but to further have to rely upon them using their automobile and gas. The deposition testimony of Mrs. White stated:

... "Did Mr. Tucker find the car for you?

"Yes, sir....

"And you purchased the 1974 Opel, is that correct?

"Answer. Yes, sir."

"What happened to the car after it was purchased, where did it go?

"Answer. You mean at my house or his?

"Yes, ma'am.

"Answer. It stayed at my house some and his house, too.

"You heard Mr. Tucker explain about it being repaired, is that pretty much correct as you recall?

"Answer. Yes, sir."

"Question. You paid for part of the repairs to the clutch?

"Answer. Yes, sir.

"Question. Did you pay Mr. Tucker anything for the work he did?

"Answer. No.

"Question. Did you know about all the work he was doing?

"Answer. I knew they was working on it, but I didn't know what.

"Question. But you knew it needed some work.

"Answer. Yes.

.    .    .    .    .

"Did you have any insurance on the car, ma'am?

"Answer. No, I didn't. If I ever got it fixed like it should have been, I was fixing to get insurance on it." (Tr. 105–113)

The above testimony shows Maude White owned the 1974 Opel. Mrs. White's testimony confirmed that she purchased the 1974 Opel which Charles Tucker found for her. Her testimony shows the Opel was not intended to be used by Charles or Betty Tucker or a member of their household, as Maude White stated it was her intention to have a vehicle which could be used by friends and family members to take her back and forth to church or the grocery store or on other errands. Mrs. White further paid for part of the repairs and intended to procure insurance for the Opel

if it was ever fixed. The Court finds this testimony to be highly credible.

In view of the above testimony, the Court concludes the 1974 Opel driven by Robert Tucker on September 16, 1981, was not furnished or available for the regular use of the named insured, Charles Tucker or Betty Tucker or a member of their household, Robert Tucker. Shelter Mutual Insurance Company is therefore liable under the contract of automobile liability insurance with Charles E. and Betty Tucker, the same being policy number 41–1–1882926–3, for liability coverage for the automobile accident which gave rise to this lawsuit. Among other things, the policy contained the following definition of persons insured for coverage for bodily injury liability and property damage liability:

> Person insured—with respect to the insurance afforded under coverages A and B, the following are insureds: ... (b) With respect to a non-owned automobile, (1) the named insured and, if an individual, his spouse, provided his or her actual operation or (if he or she is not operating) the other actual use thereof by the named insured or his spouse is with the permission, or reasonably believed to be with the permission, of the owner of such automobile and is within the scope of such permission, and (2) any other person or organization not owning or hiring the automobile, but only with respect to his or its liability because of acts or omissions of the named insured or his spouse under (b)(1) above.

Weighing the totality of all of the evidence and considering the above provision, the Court determines Shelter Mutual Insurance Company is liable under the contract of automobile liability insurance with Charles E. and Betty Tucker.